Bryan J. Harrison (SBN 277312)/Edi Kristopher (SBN 284833)
    bryan@h-klaw.com                     edi@h-klaw.com
**HARRISON | KRISTOPHER, LLP**
301 E Colorado Blvd Ste 323
Pasadena CA 91101
Phone: (866) 529-6155

Stephen A. King (SBN 2246830
    sking@kingsjusticelaw.com
**KINGS JUSTICE LAW, APC**
280 S Beverly Dr Penthouse
Beverly Hills CA 90212-3905
Phone: (323) 546-4529

Adante De Pointer (SBN 236229)/Patrick M. Buelna (SBN 317043)
    apointer@lawyersftp.com          pbuelna@lawyersftp.com
**POINTER & BUELNA**
155 Filbert St Ste 208
Oakland CA 94607-2524
Telephone: (510) 929-5400

Attorneys for Plaintiffs,
THE ESTATE OF JOSEPH MENDOZA, et al.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| THE ESTATE OF JOSEPH MENDOZA, *by and through Celina Mendoza, Zina Kumetat and Ismael Mendoza, Successors-in-Interest to Joseph Mendoza;* CELINA MENDOZA, *as an individual;* ZINA KUMETAT, *as an individual;* ISMAEL MENDOZA, *as an individual;* ADRIAN MENDOZA, *as an individual; and* SAVINA DECARLI, *as an individual,*<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; California Dept. of Corrections and Rehabilitation Secretary JEFF MACOMBER; Salinas Valley State Prison Warden KELLY SANTORO; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO.: 5:25-cv-10320-EJD<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR:**<br><br>(1) Violation of Civil Rights (Eighth & Fourteenth Amendment [42 U.S.C. § 1983]);<br>(2) Wrongful Death (Cal. C.C.P. § 377.60 et seq.);<br>(3) Negligence / Failure to Summon Medical Care (Cal. Gov. Code § 845.6);<br>(4) Negligent Hiring, Training, Supervision, and Retention;<br>(5) Negligence;<br>(6) Invasion of Privacy;<br>(7) Intentional Infliction of Emotional Distress;<br>(8) Violation of California Civil Code § 52.1 (Tom Bane Act);<br>(9) Violation of California Civil Code § 52.1 (Tom Bane Act);<br>(10) Violation of Civil Rights (Fourteenth Amendment [42 U.S.C. § 1983]); and<br>(11) Declaratory and Injunctive Relief<br><br>**DEMAND FOR TRIAL BY JURY** |

COME NOW Plaintiffs, THE ESTATE OF JOSEPH MENDOZA, by and through Celina Mendoza, Zina Kumetat and Ismael Mendoza, Successors-in-Interest to Joseph Mendoza; CELINA MENDOZA, as an individual; ZINA KUMETAT, as an individual; ISMAEL MENDOZA, as an individual; ADRIAN MENDOZA, as an individual; and SAVINA DECARLI, as an individual, for themselves and themselves alone, and allege as follows:

## **INTRODUCTION**

1.      This action arises from the wrongful death of Joseph Mendoza ("DECEDENT"), who was brutally and needlessly killed on or about April 8, 2025, while incarcerated at Salinas Valley State Prison ("SVSP"). His death was the direct and foreseeable result of the negligent acts and omissions of employees and agents of the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR"), and the deliberately indifferent conduct of individual defendants acting in their individual capacities, who failed in their constitutional and statutory duties to protect Mr. Mendoza from known threats to his safety.

2.      At the time of his death, there existed uncertainty regarding the legal marital status of DECEDENT. PLAINTIFFS are informed and believe and thereon allege, that DECEDENT and CELINA MENDOZA were married during DECEDENT'S incarceration; however, they became estranged during the time before his death. PLAINTIFFS are further informed and believe that DECEDENT may have initiated dissolution proceedings, but no record of such proceedings has been located to date.

3.      In light of this uncertainty, and in accordance with California Code of Civil Procedure sections 377.60 et seq., all potential heirs and successors-in-interest – CELINA MENDOZA (Spouse), ZINA KUMETAT (Mother), and ISMAEL MENDOZA (Father) – have been joined in this action to ensure full compliance with California's "one action rule" governing wrongful death claims. PLAINTIFFS bring this action both individually, and as successors-in-interest to THE ESTATE OF JOSEPH MENDOZA, pursuant to Code of

Civil Procedure sections 377.30 and 377.32, seeking justice and redress for the loss of a beloved son and husband.

4.    This civil rights and wrongful death action seeks to expose and remedy the deliberate indifference of individual defendants to DECEDENT'S safety, their failure to protect him from known and preventable harm, and their egregious post-incident misconduct in disseminating graphic video footage of his assault and mutilated remains. PLAINTIFFS bring this suit to obtain redress of section 1983 of title 42 of the United States Code, the Eighth and Fourteenth Amendments to the United States Constitution, California's wrongful death and survival statutes, and related state law claims, including invasion of privacy.

5.    This action seeks both wrongful death damages for the loss suffered by DECEDENT'S heirs, and survival damages recoverable by his Estate for injuries and damages he sustained prior to death, including but not limited to pain and suffering, emotional distress, and medical expenses. PLAINTIFFS reserve the right to amend this Complaint to reflect any judicial determination of heirship, marital status, or the appointment of a personal representative of the Estate.

6.    Joseph Mendoza's death represents a profound failure of the correctional system's most basic duty – to protect those in its custody from foreseeable harm. PLAINTIFFS, as his surviving family, now seek not only accountability for his loss but also to ensure that no other family endures the same preventable tragedy.

## **JURISDICTION AND VENUE**

7.    This action is brought pursuant to sections 1983 and 1988 of title 42 of the United States Code, and the Eighth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California. Jurisdiction is conferred upon this Court by sections 1331 and 1343(a) of title 28 of the United States Code. Declaratory relief is authorized by sections 2201-2202 of title 28 of the United States Code and Federal Rules of Civil Procedure, rule 57.

///

8.      This Court has the authority to grant the requested declaratory relief pursuant to sections 2201 of title 28 of the United States Code, as well as Federal Rules of Civil Procedure, rule 57, including pursuant to the Court's inherent equitable powers.

9.      Venue is proper within the Northern District of California pursuant to section 1391(b)(1)-(2) of title 28 of the United States Code because a substantial part of the events or omissions occurred in this District and at least one defendant resides here.

10.     PLAINTIFFS timely presented their government claims on July 30, 2025, pursuant to the California Government Claims Act (Gov. Code § 910 et seq.) on behalf of THE ESTATE OF JOSEPH MENDOZA, by and through Celina Mendoza, Zina Kumetat, and Ismael Mendoza, successors-in-interest to Joseph Mendoza, as well as on behalf of CELINA MENDOZA, ZINA KUMETAT, ISMAEL MENDOZA, ADRIAN MENDOZA and SAVINA DECARLI, each individually. The State failed to provide a written response within the time prescribed by Government Code section 912.4. Accordingly, the claims are deemed rejected by operation of law pursuant to Government Code section 912.4(c).

11.     With respect to these supplemental state claims, PLAINTIFFS request that this Court exercise supplemental jurisdiction pursuant to section 1367 of title 28 of the United States Code over such claims as they arise from the same facts and circumstances which underlie the federal claims.

12.     Eleventh Amendment Limitation on CDCR Liability:  Defendant CDCR, as the California Department of Corrections and Rehabilitation, is an agency of the State of California and constitutes an arm of the state for purposes of Eleventh Amendment immunity. See *Will v. Michigan Dep't of State Police* (1989) 491 U.S. 58, 70. The Eleventh Amendment bars this Court from awarding monetary damages against CDCR on any claim arising under section 1983 of title 42 of the United States Code or the United States Constitution. Accordingly, CDCR is named as a defendant in this action solely for the following limited purposes:

///

a. Vicarious Liability for State law Claims:  CDCR may be held vicariously liable for monetary damages under California Government Code section 815.2(a) for the negligent, wrongful, and intentional tortious acts of its employees acting within the scope of employment, as alleged in the Second through Ninth Causes of Action;

b. Direct Institutional Liability:  CDCR may be held directly liable for its own institutional failures in hiring, training, and supervision of employees, as alleged in the Fourth Cause of Action; and

c. Prospective Injunctive Relief:  CDCR officials in their official capacities may be ordered to provide prospective injunctive and declaratory relief to prevent ongoing constitutional violations under the doctrine of *Ex Parte Young* (1908) 209 U.S. 123, as alleged in the Eleventh Cause of Action.

CDCR is not subject to monetary damages for violations of federal constitutional rights. All federal constitutional claims under section 1983 of title 42 of the United States Code are asserted exclusively against individual defendants in their individual capacities.

## PARTIES

13.    Plaintiff CELINA MENDOZA is the estranged spouse of DECEDENT and, at all relevant times, was a resident of Merced County, California. She brings this action individually and as a potential heir and successor-in-interest to the ESTATE OF JOSEPH MENDOZA, pursuant to Code of Civil Procedure section 377.32, seeking wrongful death, survival damages, and civil rights relief under sections 1983 and 1988 of title 42 of the United States Code, as well as under the laws of the State of California. Plaintiff CELINA MENDOZA further seeks an award of attorneys' fees, including under Code of Civil Procedure section 1021.5, to vindicate significant public and civil rights interests.

14.    Plaintiff ZINA KUMETAT, the natural mother of DECEDENT, was at all relevant times a resident of Merced County, California. She joins as both an individual heir and a successor-in-interest to the ESTATE OF JOSEPH MENDOZA, seeking wrongful death, survival damages, and civil rights relief pursuant to sections 1983 and 1988 of title 42

1    of the United States Code and California law, and similarly seeks attorneys' fees under Code

2    of Civil Procedure section 1021.5.

3         15.    Plaintiff ISMAEL MENDOZA, the natural father of DECEDENT, was also

4    at all relevant times a resident of Merced County, California. He brings this action in his

5    individual capacity and as a successor-in-interest to the ESTATE OF JOSEPH

6    MENDOZA, seeking the same categories of wrongful death, survival, and civil rights

7    damages, along with attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

8         16.    THE ESTATE OF JOSEPH MENDOZA appears through its successors-in-

9    interest, Plaintiffs CELINA MENDOZA, ZINA KUMETAT, and ISMAEL MENDOZA,

10   pursuant to Code of Civil Procedure section 377.32, to recover damages sustained by

11   DECEDENT prior to his death, including his pain, suffering, fear, and conscious distress in

12   the moments leading up to his murder.

13        17.    Plaintiff ADRIAN MENDOZA is the natural brother and a surviving sibling

14   of Decedent Joseph Mendoza. He brings this action in his individual capacity for injuries

15   arising from violations of his constitutional and statutory rights and, where applicable, under

16   Code of Civil Procedure section 377.60 et seq. At all relevant times, he was a resident of

17   Merced County, California.

18        18.    Plaintiff SAVINA DECARLI is the natural sister and a surviving sibling of

19   Decedent Joseph Mendoza. She brings this action in her individual capacity for injuries

20   arising from violations of her constitutional and statutory rights and, where applicable, under

21   Code of Civil Procedure section 377.60 et seq. At all relevant times, she was a resident of

22   Sacramento County, California.

23        19.    Plaintiffs CELINA MENDOZA, ZINA KUMETAT, ISMAEL MENDOZA,

24   ADRIAN MENDOZA and SAVINA DECARLI are collectively referred to herein as

25   "PLAINTIFFS."

26        20.    Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND

27   REHABILITATION ("CDCR") is a department of the State of California charged with the

28   custody, care, supervision, and rehabilitation of inmates within the state prison system. At all

relevant times, Defendant CDCR was responsible for the policies, practices, customs, training, supervision, and discipline of correctional personnel employed at its facilities, including those assigned to Salinas Valley State Prison ("SVSP").

21.    SVSP is a state correctional facility located in Soledad, California, operated and managed by Defendant CDCR under the authority of the State of California. At all relevant times, SVSP and its agents, officers, sergeants, supervisors, and employees acted within the course and scope of their employment with CDCR.

22.    Defendant CDCR Secretary JEFF MACOMBER ("MACOMBER") was, at all relevant times, the Secretary of CDCR, and was responsible for implementing and overseeing departmental policy. He is sued in his individual capacity.

23.    SVSP Warden KELLY SANTORO ("SANTORO") was, at all relevant times, the Warden of SVSP, and was responsible for enforcing the policies and ensuring inmate safety. She is sued in her individual capacity.

24.    Defendant MATTHEW L. MADSEN ("MADSEN") is a former Correctional Lieutenant employed at SVSP. He is sued in his individual capacity. At all relevant times, Madsen was assigned as a visitation officer responsible for supervising inmate visitation and controlling what items entered the secure perimeter during visits. On February 4, 2026, a federal criminal complaint was unsealed in the Northern District of California, Case No. CR 26-70111-MAG, charging MADSEN with conspiracy to commit honest services wire fraud in violation of sections 1343, 1346, and 1349 of title 18 of the United States Code for smuggling cellphones and tobacco into SVSP between January 2023 and February 2025 in exchange for payments from an inmate. During a voluntary, recorded interview on February 3, 2025 – twelve days after the January 22, 2025, heroin seizure from DECEDENT – MADSEN admitted to bringing telephones and tobacco into SVSP at an inmate's request, in exchange for money, and stated he had been paid approximately $100,000 for his role in the scheme. He was relieved of active duty in February 2025. The supporting federal affidavit further reveals that text messages recovered from confiscated inmate devices contained explicit requests for narcotics, including cannabis concentrate ("wax") and

methamphetamine ("ice"), directed to the same smuggling pipeline through which MADSEN operated. The federally charged smuggling period directly overlaps with DECEDENT'S repeated possession of substantial quantities of narcotics and contraband inside SVSP.

25.     CDCR's Vicarious Liability (State Law Only):  Defendant CDCR is liable under California Government Code section 815.2(a) for the negligent and wrongful acts and omissions of its employees, agents, and representatives acting within the scope of their employment, as alleged in the state law causes of action (Second through Ninth Causes of Action). CDCR is also directly liable for its own institutional negligence in hiring, training, and supervising employees (Fourth Cause of Action). CDCR is not subject to liability for monetary damages on any federal constitutional claim.

26.     Individual Defendants' Liability (Federal and State law):  Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, acting in their individual capacities, are personally liable for their own acts and omissions that violated DECEDENT's and PLAINTIFFS' rights under the United States Constitution and California law. These individual defendants ("Individual Defendants") acted under color of state law and are subject to liability for compensatory and punitive damages, as alleged in the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action.

27.     Defendant DOES 1 through 50 are correctional officers, supervisors, medical staff, and other employees and agents of CDCR, whose true names and capacities are presently unknown. PLAINTIFFS are informed and believe, and thereon allege, that each such Defendant personally participated in, directed, condoned, or otherwise contributed to the acts, omissions, policies, practices, and customs that resulted in the violations of DECEDENT'S constitutional and statutory rights, his wrongful death, and the unauthorized dissemination of video footage depicting his fatal assault.

28.     PLAINTIFFS further allege that DOES 1 through 50 include those individuals who denied DECEDENT'S repeated requests for protection, failed to intervene during the attack, neglected to render timely medical care, and/or disseminated or facilitated

the dissemination of confidential and graphic video footage of the incident. PLAINTIFFS will amend this COMPLAINT to substitute the true names and capacities once ascertained.

29.     At all relevant times, each DOE Defendant was a state employee or agent employed by CDCR who acted under color of state law. In their individual capacities, each DOE Defendant personally participated in, directed, authorized, or knowingly acquiesced in the constitutional violations alleged herein. To the extent Plaintiffs assert state law claims against Defendant CDCR and/or DOE Defendants, each DOE Defendant acted within the course and scope of employment, and CDCR maintained and enforced policies, customs, and practices as alleged herein that caused the injuries and damages suffered by Plaintiffs and DECEDENT.

30.     PLAINTIFFS are informed and believe, and on that basis allege, that at all relevant times each Defendant was the agent, servant, employee, representative, and/or joint actor of each other Defendant, and, in doing the acts alleged, acted within the course and scope of such agency and employment and with the authorization, ratification, consent, and approval of the remaining Defendants.

31.     Pursuant to California Government Code section 815.2(a), CDCR is vicariously liable for the wrongful acts and omission in violation of state law committed by DOES 1 through 50 within the course and scope of their employment.

32.     All claims pursuant to section 1983 of title 42 of the United States Code are asserted against DOES 1 through 50 in their in individual capacities. PLAINTIFFS seek prospective injunctive and declaratory relief against Defendant CDCR.

33.     At all relevant times, DOES 1 through 50, and each of them, acted under color of state law. In their individual capacities, Defendants MACOMBER and SANTORO personally established, implemented, and permitted the constitutional and statutory violations alleged herein, and each personally participated in, supervised, directed, authorized, or knowingly acquiesced in such violations. To the extent Plaintiffs assert state law claims against Defendant CDCR, the conduct of DOES 1 through 50 was performed

within the course and scope of their employment, and CDCR maintained and enforced policies and customs that caused the violations under state law.

34.    Defendants CDCR, MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 are collectively referred herein as "DEFENDANTS."

## STATEMENT OF FACTS

### A.  Background of Decedent and the Institutional Environment

35.    On or about July 29, 2009, Decedent Joseph Mendoza ("DECEDENT") was received by Salinas Valley State Prison ("SVSP") to serve a sentence of approximately twenty-two (22) years and four (4) months. At all relevant times, he was housed under the custody and control of the California Department of Corrections and Rehabilitation ("CDCR").

36.    In September 2020, the California Legislature enacted Assembly Bill 2655, codified at Penal Code section 647.9 and known as the "Kobe Bryant Act of 2020." This statute imposes a legal duty on all first responders, including law enforcement and correctional personnel, to safeguard the privacy and dignity of victims by prohibiting the photographing, recording, or dissemination of images of deceased persons except when required for an official law enforcement purpose or a legitimate public interest. The Legislature expressly recognized a duty of confidentiality and respect owed by first responders to victims and their families, emphasizing that such sensitive images must never be taken, shared, or used for personal purposes.

37.    In or about November 2023, the CDCR's Division of Adult Institutions launched a pilot program allowing SVSP staff to possess and use personal cell phones while on duty within the secure perimeter of the facility. This initiative authorized the presence of personal devices in restricted areas, significantly increasing the risk of unauthorized recordings, photographs, and the potential disclosure of confidential institutional information. This policy remained in effect at all relevant times.

38.    At all relevant times, SVSP was a Level IV high-security institution housing validated gang members and inmates known for serious violence. SVSP staff, including

custody officers, supervisors, and Investigative Services Unit ("ISU") personnel, were trained and aware of the culture of gang-enforced narcotics trafficking and violent retaliation within the institution.

39.     At all relevant times, DECEDENT was documented in CDCR records as affiliated with the Norteño prison gang. SVSP personnel were aware of his affiliation and of the violent enforcement mechanisms utilized when narcotics debts are incurred within gang-controlled distribution networks.

40.     Within California state prisons, narcotics in substantial quantities are commonly owned or controlled by prison gangs. It is widely understood among custody staff and ISU personnel that when narcotics of such magnitude are confiscated, the inmate found in possession faces a substantial and immediate risk of violent retaliation for the "loss" of gang-controlled property. This risk is not speculative – it is an inevitable consequence of the gang enforcement structure, and it is a fact known to every correctional officer, sergeant, lieutenant, and ISU agent who has worked inside a Level IV institution.

**B.  The 2018 Narcotics Incident**

41.     In or about 2018, DECEDENT was discovered in possession of approximately 29.2 grams of marijuana concentrate ("wax") and approximately 2.05 grams of methamphetamine while incarcerated at SVSP. This discovery placed SVSP staff on notice that DECEDENT was involved in narcotics activity within the institution and was therefore at heightened risk from the gang enforcement mechanisms that govern such activity.

**C.  Heroin Seizure on January 22, 2025, and Creation of a Death Sentence**

42.     On January 22, 2025, DECEDENT was discovered in possession of approximately 39.21 grams of heroin while housed at SVSP. This quantity far exceeded personal use and was consistent with gang-controlled narcotics distribution within CDCR institutions.

43.     Upon information and belief, DECEDENT worked in coordination with Defendant MADSEN to introduce and distribute narcotics on behalf of the Norteño prison

gang through the visitation channel at SVSP. DECEDENT'S institutional employment in the visitation area, combined with MADSEN'S control over what entered the secure perimeter during visits, provided the operational mechanism through which gang-controlled narcotics were smuggled into the facility and distributed to Norteño-affiliated inmates. When DECEDENT was discovered in possession of approximately 39.21 grams of heroin on January 22, 2025, before completing delivery, he was unable to transfer the narcotics to their intended recipients, thereby creating a substantial gang debt and immediate exposure to violent retaliation.

44.     In CDCR institutions, an inmate who "loses" narcotics belonging to a gang is subject to severe punishment, including assault or homicide. SVSP staff were aware of this dynamic and understood the lethal consequences that would predictably follow the confiscation of over 39 grams of heroin from DECEDENT.

45.     Pursuant to sections 3335 and 3375 of title 15 of the California Code of Regulations, and the CDCR Department Operations Manual ("DOM"), staff are required to immediately remove and segregate inmates who face credible threats of retaliation following events such as large narcotics seizures. This obligation is mandatory and nondiscretionary.

**D. Decedent's Repeated Pleas for Protection and the Seventy-Six-Day Refusal to Act**

46.     Following the January 22, 2025, heroin seizure, DECEDENT made multiple formal and informal requests for protective custody, expressly informing SVSP staff that he feared for his life and anticipated violent retaliation from gang-affiliated inmates who would hold him accountable for the loss of their narcotics.

47.     Despite the substantial quantity of heroin seized, the known gang retaliation culture, DECEDENT'S documented Norteño affiliation, and his repeated, desperate pleas for protection, DEFENDANTS refused to segregate, re-house, or transfer DECEDENT for seventy-six (76) consecutive days.

48.     During this seventy-six-day period – from January 22, 2025, through April 8, 2025, the date of his murder – DECEDENT remained housed in general population among

gang-affiliated inmates who had motive and opportunity to retaliate against him. Every single day that DEFENDANTS left DECEDENT in general population was a conscious decision to expose him to a known, substantial, and escalating risk of death.

49.     Upon information and belief, staff further disclosed or permitted the dissemination of information regarding the heroin seizure and DECEDENT'S protective custody requests, thereby increasing the likelihood that he would be targeted as responsible for the loss of gang-controlled narcotics and marking him as a perceived informant. This disclosure was not inadvertent – it was a deliberate act that functioned as a death warrant.

50.     This disclosure violated CDCR confidentiality and inmate safety protocols, including sections 3321, 3335, and 3375 of title 15 of the California Code of Regulations, and the DOM, which prohibit disclosure of confidential safety/classification information and mandate immediate rehousing when a retaliation risk is identified. DEFENDANTS ignored these mandates, allowing sensitive information about the narcotics seizure and protective custody request to circulate within the inmate population.

51.     DOES 1 through 50, including the watch commander and other custodial staff, acted with deliberate indifference to DECEDENT'S pleas for protection and took no meaningful steps to safeguard his safety or well-being. Rather than protecting DECEDENT, SVSP's staff recklessly disclosed that DECEDENT had been found with substantial amounts of narcotics which, upon information and belief, belonged to gang-affiliated inmates. DEFENDANTS further disclosed his protective custody request to the inmate population, branding him an informant and target, thereby substantially increasing the likelihood of retaliation, assault, and death.

52.     Despite clear, documented indicators that DECEDENT faced an imminent and escalating threat – including over 39 grams of confiscated heroin believed to belong to gang-affiliated inmates, his Norteño affiliation, explicit protective custody requests, and the disclosure of those requests to the inmate population – SVSP staff and DOES 1 through 50 failed to re-house, transfer, or otherwise safeguard him, in violation of sections 3321, 3335, 3375 of title 15 of the California Code of Regulations and the DOM. DEFENDANTS'

1    inaction and deliberate indifference directly caused and contributed to DECEDENT'S

2    brutal murder on April 8, 2025.

3    **E. Correctional Lieutenant Matthew L. Madsen and the Contraband Pipeline**

4    53.    During the time period encompassing both the 2018 and 2025 narcotics

5    incidents, Correctional Lieutenant Matthew L. Madsen ("MADSEN") was employed at

6    SVSP and assigned as a visitation officer responsible for supervising inmate visitation and

7    controlling what items entered the secure perimeter during visits.

8    54.    During those same periods, DECEDENT was assigned institutional

9    employment duties cleaning and maintaining the visitation area inside SVSP, providing him

10   regular physical access to the controlled visitation environment overseen by MADSEN.

11   55.    In addition to his custodial duties in the visitation area, DECEDENT was a

12   talented artist who was tasked by SVSP with painting a mural for the institution. This

13   assignment further deepened DECEDENT'S direct working relationship with institutional

14   staff, including MADSEN, and required the receipt of outside materials through controlled

15   entry channels.

16   56.    DECEDENT'S parents, Plaintiffs ZINA KUMETAT and ISMAEL

17   MENDOZA, regularly visited DECEDENT at SVSP and personally interacted with

18   MADSEN in his official capacity as visitation officer.

19   57.    Plaintiff ZINA KUMETAT personally donated art materials and supplies to

20   SVSP for DECEDENT to use in painting the institutional mural. The officer who accepted

21   these donated materials from outside the secure perimeter and delivered them to

22   DECEDENT inside the institution was Defendant MADSEN. This documented pattern of

23   conduct – in which MADSEN received items from a person outside the prison and

24   personally transferred those items to an inmate inside the secure perimeter – demonstrates

25   the precise mechanism by which contraband, including narcotics, could be and was

26   introduced into SVSP through the visitation channel under MADSEN's control.

27   58.    On July 20, 2024, DECEDENT was involved in a fistfight with inmate

28   Melendez in the Visiting area of Facility C at SVSP. Defendant MADSEN served as the

Incident Commander for this altercation. In this capacity, MADSEN was responsible for directing the institutional response, supervising staff, documenting the incident, and making classification and housing determinations related to the involved inmates. This incident further demonstrates that MADSEN had direct, documented, supervisory contact with DECEDENT well beyond a passive visitation post – MADSEN personally oversaw the institutional response to a use-of-force event involving DECEDENT in the very area where DECEDENT worked and where, upon information and belief, contraband was introduced into the institution under MADSEN's control.

59.    The introduction of narcotics into a secure state prison requires access through controlled entry points, including visitation. Inmates housed within the general population do not have independent ability to obtain narcotics absent introduction by staff, visitors, contractors, or other authorized entrants.

60.    On February 4, 2026, approximately ten months after DECEDENT'S murder, a federal criminal complaint was unsealed in the Northern District of California, Case No. CR 26-70111-MAG, charging former SVSP Correctional Lieutenant, Defendant MADSEN, with conspiracy to commit honest services wire fraud in violation of sections 1343, 1346, and 1349 of title 18 of the United States Code for smuggling cellphones and tobacco to inmates at SVSP between January 2023 and February 2025 in exchange for approximately $100,000 in bribes from an inmate. During a voluntary, recorded interview conducted on February 3, 2025 – twelve days after the January 22, 2025, heroin seizure from DECEDENT – MADSEN admitted to bringing telephones and tobacco into SVSP at an inmate's request, in exchange for money, and stated he communicated with the inmate's spouse to plan smuggling events. MADSEN confirmed he had received approximately $100,000 for his role in the scheme, including electronic payments via Zelle from members of the inmate's family. The inmate's spouse separately admitted to delivering approximately twenty phones with chargers to MADSEN in Salinas, California, and to paying MADSEN approximately $20,000 in cash. The supporting federal affidavit further reveals that text messages recovered from confiscated inmate devices contained explicit requests for

narcotics – including cannabis concentrate ("wax"), methamphetamine ("ice"), and other controlled substances – directed through the same smuggling pipeline in which MADSEN operated. Financial records documented in the affidavit show at least $19,650 flowing from inmate family members to MADSEN between July 2023 and February 2024, and at least $32,600 from a second family member to MADSEN between May 2024 and January 2025. MADSEN was relieved of active duty in February 2025. If convicted, MADSEN faces up to twenty (20) years in federal prison. While the federal complaint formally charges smuggling of cellphones and tobacco, the contraband types found in DECEDENT'S possession on January 22, 2025 – 39.21 grams of heroin, fentanyl, tobacco, micro SD cards, and SIM cards – are consistent with the full scope of the smuggling operation documented in the federal affidavit, which encompassed narcotics alongside electronic devices and tobacco.

61.    The federally charged smuggling period directly overlaps with DECEDENT'S repeated possession of substantial narcotics inside SVSP. Upon information and belief, DECEDENT and MADSEN were actively working together to introduce contraband into SVSP on behalf of the Norteño prison gang. MADSEN utilized his position controlling the visitation entry channel to bring narcotics past security protocols, and DECEDENT, assigned to work in the visitation area, retrieved and distributed the contraband within the institution. The 39.21 grams of heroin seized from DECEDENT on January 22, 2025, were introduced into SVSP through this jointly operated contraband pipeline.

62.    As MADSEN'S co-conspirator in the contraband smuggling operation, DECEDENT possessed direct, firsthand knowledge of MADSEN'S criminal conduct, including the specific mechanisms of contraband introduction, the identity of the corrupted officer, the distribution routes within the institution, and the gang hierarchy directing the operation. A deceased inmate cannot provide such information. DEFENDANTS' refusal to protect DECEDENT served not only institutional indifference but also the personal interests of those within SVSP – including Defendant MADSEN – who stood to be exposed by his continued survival and potential cooperation with investigators.

///

63.     Upon information and belief, DECEDENT'S mother informed investigators that she believed DECEDENT had access to contraband smuggling through his dayroom job assignment, and that "soon after [DECEDENT] was killed, the prison changed the guard that had worked in the dayroom, that guard's name was Fonseca." The removal of dayroom staff shortly after DECEDENT'S murder suggests CDCR's awareness of staff involvement in contraband operations that led to DECEDENT'S exposure to gang retaliation.

64.     The quantity and sophistication of contraband seized from DECEDENT on January 22, 2025 – 39.21 grams of heroin, 0.04 grams of fentanyl, 7.36 grams of tobacco, micro SD cards, and SIM cards – is consistent with distribution-level operations that could not occur without staff facilitation. MADSEN'S subsequent federal criminal complaint for smuggling cellphones and tobacco confirms that officer-facilitated contraband operations existed at SVSP during the period DECEDENT was housed there. DECEDENT had multiple prior contraband seizures between 2016–2021, including cellphones and tobacco. These repeated seizures of identical contraband types later confirmed to be smuggled by Lieutenant MADSEN demonstrate a longstanding pattern that CDCR knew or should have known required staff corruption to sustain.

65.     CDCR's failure to prevent, investigate, or discipline staff corruption in contraband smuggling directly enabled the gang-controlled drug distribution network that placed DECEDENT at mortal risk when he was found with 39.21 grams of heroin – gang property whose "loss" predictably triggered the violent retaliation that killed him.

**F.  The Savage Attack of April 8, 2025**

66.     On April 8, 2025, while housed in the general population at SVSP, DECEDENT, then 36 years old, was brutally and savagely attacked by inmates Edgar Frayre and Nicolas Young on the dayroom floor of Facility C. Both assailants were known to SVSP personnel and DOES 1 through 50 as dangerous, violent offenders affiliated with the Norteño prison gang and had previously exhibited hostility toward DECEDENT.

///

67.     The attack occurred on the dayroom floor of Facility C, a well-known high-risk area within the institution, despite prior intelligence indicating an imminent threat to DECEDENT'S life and multiple opportunities for Defendant SVSP staff and DOES 1 through 50 to intervene or prevent the violence.

68.     The assault lasted in excess of three (3) minutes, as confirmed by institutional surveillance footage and handheld recordings obtained by PLAINTIFFS.

69.     Armed with makeshift knives ("shanks"), the assailants repeatedly stabbed DECEDENT nearly one-hundred-eighty (180) times, inflicting deep and fatal wounds to his torso, back, face, neck, head, and eyes. The video evidence demonstrates that DECEDENT was defenseless, overwhelmed, and suffering catastrophic injuries while correctional officers stood by and watched.

### G. Failure to Intervene and Provide Medical Aid

70.     During this prolonged and lethal attack, uniformed correctional officers were present, armed, and in direct visual proximity to the assault. Officers were equipped with Mini-14 rifles, chemical agents, alarms, and were trained in deadly-force intervention protocols.

71.     The delay in intervention was not momentary or the result of split-second judgment. For over three minutes, officers observed the attack while DECEDENT was defenseless and overwhelmed. Despite training and policy authorizing the use of necessary force to prevent serious bodily injury or death, staff failed to discharge firearms, deploy effective chemical agents, or otherwise intervene in a constitutionally adequate manner.

72.     As the attack unfolded, DEFENDANTS not only were understaffed, but failed to summon immediate backup or medical assistance during the attack, in direct violation of established CDCR protocols, including those for emergency response and use of force. This delay allowed the assailants to continue their violent assault uninterrupted, resulting in catastrophic injuries.

73.     When staff eventually responded, DECEDENT was found unresponsive, bloodied, and mortally wounded. Despite the obvious severity of his injuries,

DEFENDANTS failed to provide timely or adequate medical care, including basic life-saving measures (e.g., CPR) or immediate transport to an emergency medical facility.

74.    After the assault concluded, DECEDENT lay motionless and bleeding. DEFENDANTS further failed to summon immediate medical assistance or initiate prompt life-saving measures as required under Government Code section 845.6 and CDCR emergency response policies.

75.    DEFENDANTS' failure to act, despite their training, equipment, and legal duty to protect inmates from known threats, constituted deliberate indifference to DECEDENT'S safety and directly and proximately caused his agonizing and preventable death.

76.    Following the attack, SVSP staff failed to preserve and secure critical evidence, including video surveillance, incident reports, and log entries, in violation of CDCR policy and federal civil rights standards, obstructing accountability and transparency.

**H. Unauthorized Dissemination of Graphic Footage**

77.    Following DECEDENT'S murder on April 8, 2025, SVSP personnel deliberately and/or recklessly disseminated graphic video footage of the attack and its aftermath to unauthorized recipients, including through social media. Upon information and belief, certain SVSP personnel recorded, possessed, and shared video footage of the attack and DECEDENT'S bloodied and mutilated remains via their personal cell phones – devices permitted within the secure perimeter under the November 2023 pilot program – to non-authorized individuals, including other staff members, acquaintances, family members, and across social media platforms.

78.    As a result of this egregious conduct, members of the Mendoza family – Plaintiffs CELINA MENDOZA, ZINA KUMETAT, ISMAEL MENDOZA, ADRIAN MENDOZA and SAVINA DECARLI – were exposed to the graphic, publicized images and videos depicting their loved one's violent death and bloodied, mutilated remains. PLAINTIFFS have endured profound psychological and emotional trauma from witnessing these images, which continue to circulate online, compounding their grief and distress.

79.     The unauthorized dissemination of this video footage constitutes not only an invasion of privacy and intentional infliction of emotional distress, but also a continuing violation of PLAINTIFFS' constitutional rights under the Fourteenth Amendment to due process and familial association.

## I.  Prior Violence, Institutional Reports, and Supervisory Notice

80.     SVSP has experienced a persistent and well-documented pattern of lethal inmate-on-inmate violence, particularly involving gang-affiliated inmates using inmate-manufactured weapons in housing unit dayrooms and recreational yards – the same setting and circumstances in which DECEDENT was murdered. During the period of Defendant MACOMBER's tenure as CDCR Secretary (December 2022 to the present), the following homicides occurred at SVSP, each of which was reported to CDCR leadership through mandatory reporting channels and public press releases issued by CDCR itself:

81.     On March 21, 2023, incarcerated person Steven Lovely was stabbed approximately fifty (50) times by two inmates in the dayroom at SVSP using inmate-manufactured weapons. Lovely died five days later. The entire attack was captured on institutional video. On December 14, 2023, incarcerated person Oracio Ramirez was attacked by two inmates in the recreational yard at SVSP and died from his injuries. Officers recovered inmate-manufactured weapons at the scene. On January 6, 2024, an incarcerated person was found dead in his cell at SVSP, and the death was determined to be a homicide. On September 30, 2024, incarcerated person Colin Hebert was found unresponsive in his cell at SVSP after being killed by his cellmate; an inmate-manufactured weapon was recovered at the scene. Each of these homicides was publicly reported by CDCR, investigated by SVSP's Investigative Services Unit, and reported to the Office of the Inspector General. All occurred prior to DECEDENT's murder on April 8, 2025.

82.     In addition to SVSP-specific violence, Defendants MACOMBER and SANTORO were on notice of systemic failures in inmate safety and staff accountability through multiple reports issued by the California Office of the Inspector General ("OIG"). In 2019, the OIG conducted a Special Review of SVSP's processing of inmate allegations of

staff misconduct and found that during a six-month period in 2017–2018, SVSP generated nine percent (9%) of all misconduct complaints statewide while housing only 2.7% of the state's incarcerated population, and that 97% of those complaints resulted in no finding of staff misconduct – a rate the OIG determined indicated systemic bias. The OIG's findings led to the creation of a $10 million statewide Allegation Inquiry Management Section. In a 2021 follow-up report, the OIG found that these reforms had "failed" and that the misconduct investigation process "remains broken," with no staff misconduct found in 98% of cases across all CDCR facilities.

83.    The OIG's 2024 Annual Report, issued during Defendant MACOMBER's tenure, further documented that officers and medical staff failed to report or timely report use of force in sixteen (16) of thirty-three (33) significant incidents monitored by the OIG, and that hiring authorities agreed to refer only three of those sixteen incidents for investigation. The OIG identified failure to report force – either used or witnessed – as an "ongoing issue" for CDCR. In a separate 2024 review, the OIG examined 162 closed disciplinary and staff misconduct cases and determined that the department's performance was "poor both in conducting staff misconduct investigations and in handling the employee disciplinary process." In the first half of 2025, the OIG rated CDCR's overall performance "inadequate" in 86 of 199 cases (43%) and "improvement needed" in an additional 85 cases (43%), with only 28 cases (14%) rated adequate.

84.    Defendant SANTORO became acting warden of SVSP on January 30, 2025 – eight days after the January 22, 2025, heroin seizure from DECEDENT. She assumed command of an institution with a documented history of lethal gang violence, systemic failures in staff accountability, and an active, unresolved threat to an inmate who had been found with over 39 grams of gang-controlled heroin and who had repeatedly requested protective custody. Defendant SANTORO was briefed on and had access to all institutional records, classification files, and pending protective custody requests, including DECEDENT's. Despite inheriting direct supervisory authority over SVSP at a moment when DECEDENT's life was in immediate and documented jeopardy, Defendant

1    SANTORO took no action to segregate, re-house, or transfer him during the remaining

2    sixty-eight (68) days before his murder.

3    **J.  Customs, Policies, and Practices Fostering Deliberate Indifference**

4    85.    The conduct of Defendants DOES 1 through 50, and each of them, was

5    malicious, oppressive, and carried out with reckless disregard for the life and dignity of

6    Decedent Joseph Mendoza. Their actions and omissions were the moving force behind the

7    constitutional violations and the tragic death of DECEDENT.

8    86.    At all relevant times, Defendant CDCR, through its supervisory personnel,

9    maintained and permitted customs, policies, and practices that fostered a culture of

10   deliberate indifference toward inmate safety, particularly regarding known gang retaliation

11   threats, protective custody requests, and the handling of sensitive/confidential video

12   footage.

13   87.    These customs and practices included, without limitation:

14         a.   Failing to properly investigate, document, and respond to credible threats

15              of violence against inmates;

16         b.   Failing to immediately segregate inmates facing predictable gang retaliation

17              following large narcotics seizures, in violation of sections 3335 and 3375 of

18              title 15 of the California Code of Regulations, and the CDCR Department

19              Operations Manual;

20         c.   Permitting discretion to ignore or minimize protective custody requests,

21              even when those requests were accompanied by documented, credible

22              threats of lethal violence;

23         d.   Encouraging or tolerating retaliatory disclosure of inmate safety concerns

24              to the general population, including disclosing confidential information

25              regarding narcotics seizures and protective custody requests;

26         e.   Failing to train or discipline officers and supervisory personnel in

27              recognizing and responding to foreseeable threats of inmate-on-inmate

28              violence;

f.   Failing to ensure timely intervention and medical aid during active assaults;

g.   Permitting SVSP personnel to possess and use personal cellular devices within the secure perimeter of the SVSP facility without oversight, regulation, or monitoring;

h.   Failing to safeguard confidential surveillance footage, and permitting the unauthorized dissemination of graphic video materials depicting inmate assaults and fatalities;

i.   Tolerating and failing to prevent staff corruption in contraband smuggling operations at SVSP, despite actual knowledge of officer-facilitated operations evidenced by the February 2026 federal criminal complaint charging SVSP Lieutenant MADSEN with smuggling cellphones and tobacco – the identical contraband types seized from DECEDENT – in exchange for $100,000 in bribes from an inmate;

j.   Failing to investigate, discipline, or implement internal controls to detect staff involvement in contraband distribution, despite obvious indicators including distribution-level quantities, repeated seizures of identical contraband types from multiple inmates, family allegations of specific officers facilitating smuggling, and staff reassignments following inmate deaths related to gang drug retaliation;

k.   Failing to comply with established staffing guidelines, protocols, and procedures necessary to ensure the safety and security of both inmates and officers; and

l.   Encouraging or tolerating a culture of impunity in which staff conduct – including contraband smuggling, evidence leaks, and failure to intervene – went uninvestigated, undisciplined, and unremedied.

88.   These widespread customs and systemic failures were well known to CDCR leadership and SVSP supervisory officials, who had long been aware of a pattern of similar violent incidents and deliberate indifference to inmate safety and privacy. The February 2026

federal criminal complaint charging SVSP Lieutenant MADSEN proves CDCR had actual knowledge that officers were operating six-figure contraband smuggling operations at the facility where DECEDENT was housed and killed – using the identical contraband types (cellphones, tobacco) seized from DECEDENT on January 22, 2025. MADSEN's own admission to federal agents on February 3, 2025, and his relief from active duty that same month, demonstrate that CDCR was on actual notice of staff-facilitated contraband smuggling at SVSP during the seventy-six-day period DECEDENT was left unprotected in general population. CDCR's tolerance of the underlying staff corruption that enabled contraband distribution was the moving force behind DECEDENT'S vulnerability and subsequent murder.

89.     Despite this knowledge, CDCR and SVSP officials failed to take corrective action, including implementing adequate safeguards for confidential evidence, supervising staff with access to sensitive materials, enforcing policies to prevent unauthorized disclosure of assault footage, and ensuring that inmates facing credible retaliation threats were immediately segregated from general population.

## K.  The Totality of Deliberate Indifference

90.     The seventy-six-day refusal to segregate DECEDENT following the heroin seizure, combined with the staff disclosure of his protective custody requests, the failure to intervene during a prolonged and lethal assault captured on video, and the subsequent dissemination of the footage of his murder, constituted deliberate indifference to a substantial and known risk of serious harm in violation of the Eighth Amendment. DEFENDANTS knew DECEDENT faced certain retaliation. DEFENDANTS knew DECEDENT had begged for help. DEFENDANTS chose to do nothing. And when the inevitable occurred, their officers stood by and watched him die.

91.     The systemic deficiencies in training, supervision, and discipline at SVSP created a foreseeable and dangerous environment, enabling staff to act with impunity and disregard for inmate safety and confidentiality, directly resulting in DECEDENT'S death and the public exposure of his murder.

92.     As a direct and proximate result of these policies, customs, and practices, PLAINTIFFS have suffered the devastating loss of their family member, compounded by ongoing public humiliation, emotional anguish, and re-traumatization caused by the viral dissemination of the attack video.

**L.  Respondeat Superior and Vicarious Liability**

93.     Under the doctrine of respondeat superior, employers, including public entities such as the CDCR, are vicariously liable for the wrongful acts and omissions of their employees committed within the course and scope of their employment. At all relevant times, DOES 1 through 50, employed at SVSP, acted within the scope of their official duties as custodial personnel of the CDCR.

94.     Defendant CDCR owed a legal duty of care to ensure the safety, security, and protection of all inmates in its custody, including DECEDENT. The failure of SVSP/CDCR employees, including DOES 1 through 50, to respond appropriately to DECEDENT'S repeated requests for protective custody, to prevent or mitigate the attack that led to his death, and to prevent the widespread dissemination of video footage of his murder and mutilated remains, constitutes a breach of that duty.

95.     As the entity responsible for the operation, supervision, and management of SVSP, Defendant CDCR is vicariously liable for the negligent acts and omissions of its employees under state law.

96.     Accordingly, Defendant CDCR is directly and vicariously liable for the harm and damages suffered by DECEDENT and PLAINTIFFS as a result of the actions and omissions of employees of SVSP, each of whom acted within the course and scope of their employment.

97.     At all relevant times, DOES 1 through 50 were employed by Defendant CDCR and were acting under the authority of their positions as correctional officers, sergeants, supervisors, or staff members. Their failure to protect DECEDENT, failure to provide timely medical intervention, and participation in or facilitation of the dissemination

1    of the attack video were actions taken while acting under color of state law and within the

2    scope of their employment.

3         98.    Defendant CDCR, through their agents and employees, owed DECEDENT a

4    duty to ensure his safety, security, and humane treatment while in state custody. The failure

5    of these employees, including DOES 1 through 50, to honor DECEDENT'S repeated

6    protective custody requests, to provide adequate supervision, to render timely and

7    reasonable medical aid, and to prevent dissemination of graphic footage of his murder,

8    constitutes a breach of that duty, for which CDCR is directly and vicariously liable.

9    **<u>FIRST CAUSE OF ACTION</u>**

10    **VIOLATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**

11    **Violation of 8th Amendment – Failure to Protect from Harm**

12    **(By THE ESTATE OF JOSEPH MENDOZA Against Defendants**

13    **MACOMBER, SANTORO, MADSEN, and DOES 1 through 50)**

14         99.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs

15    as though fully set forth herein.

16         100.    At all relevant times, Defendants MACOMBER, SANTORO, MADSEN, and

17    DOES 1 through 50, acted under color of state law, and within the scope of their

18    employment as custodial and supervisory personnel of the State of California.

19         101.    The Eighth Amendment to the United States Constitution prohibits cruel and

20    unusual punishment and requires prison officials to take reasonable measures to guarantee

21    the safety of inmates.

22         102.    DECEDENT was under the care, custody, and control of DEFENDANTS

23    while incarcerated at SVSP. As such, Defendants MACOMBER, SANTORO, MADSEN,

24    and DOES 1 through 50 owed DECEDENT a constitutional duty to protect him from

25    known and substantial risks of serious harm and to provide timely and adequate medical care

26    when that risk materialized.

27         103.    Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50

28    knew or should have known that DECEDENT faced imminent danger from gang-affiliated

inmates, including Edgar Frayre and Nicolas Young, who had a known history of violence and hostility toward him. Despite clear and repeated warnings, Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 failed to act reasonably to prevent the assault or to re-house DECEDENT in a safe environment.

104.    The deliberate decisions of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 to keep DECEDENT in the general population, despite explicit requests for protective custody and documented gang threats, constituted deliberate indifference to a substantial risk of serious harm in violation of the Eighth Amendment.

105.    Defendant MADSEN, in particular, possessed subjective knowledge that the January 22, 2025, heroin seizure created a substantial and specific risk of lethal harm to DECEDENT. Upon information and belief, MADSEN and DECEDENT were co-conspirators in the contraband smuggling operation through which the seized narcotics were introduced into SVSP. MADSEN personally controlled the visitation entry channel through which the heroin entered the facility, and DECEDENT distributed that contraband within the institution on behalf of the Norteño prison gang. MADSEN, therefore, knew with certainty that the confiscated heroin belonged to or was controlled by gang-affiliated inmates, because he had personally smuggled it into the facility. MADSEN further knew, based on his years of experience at a Level IV institution and his direct participation in the narcotics supply chain, that an inmate who "loses" gang-controlled narcotics of this magnitude faces certain violent retaliation, up to and including death. Despite this particularized and personal knowledge, MADSEN took no action to protect DECEDENT from the lethal consequences of the very contraband pipeline they had jointly operated. MADSEN's own February 3, 2025, admission to federal agents – that he smuggled contraband into SVSP at an inmate's request in exchange for approximately $100,000 – confirms that he personally participated in the institutional corruption that placed DECEDENT at mortal risk and possessed firsthand knowledge of the gang-controlled distribution network whose enforcement mechanisms predictably killed DECEDENT.

106.    Upon information and belief, MADSEN's failure to act to protect DECEDENT was motivated not only by deliberate indifference but also by personal self-interest in eliminating a co-conspirator who could directly implicate him in federal crimes. DECEDENT, as MADSEN'S operational partner in the contraband smuggling pipeline, possessed direct personal knowledge of MADSEN'S criminal conduct – including the specific mechanisms of contraband introduction through the visitation channel, the financial arrangements underlying the smuggling operation, and the identity of the corrupted officer facilitating the pipeline. This knowledge made DECEDENT uniquely dangerous to MADSEN. A living DECEDENT, particularly one facing gang retaliation and potential criminal prosecution for the January 22, 2025, heroin seizure, represented an acute and immediate threat to expose MADSEN's smuggling operation through cooperation with law enforcement. MADSEN's deliberate indifference to the known, substantial, and lethal risk facing DECEDENT following the heroin seizure thus served both institutional indifference and MADSEN's personal interest in ensuring the permanent silence of the one inmate who could most directly connect him to the federally charged smuggling conspiracy. The timeline confirms this inference: by February 3, 2025 – just twelve days after the heroin seizure from DECEDENT – federal agents had already confronted MADSEN and obtained his admission, demonstrating that the smuggling operation was under active investigation at the very moment DECEDENT was left unprotected in general population.

107.    Prior to the April 8, 2025, attack, Defendants MACOMBER and SANTORO had actual knowledge of a pattern of lethal inmate-on-inmate violence at SVSP, including the stabbing death of Steven Lovely in the SVSP dayroom on March 21, 2023, the killing of Oracio Ramirez in the SVSP recreational yard on December 14, 2023, the January 6, 2024 in-cell homicide, and the killing of Colin Hebert on September 30, 2024. Each of these homicides was reported to CDCR leadership through mandatory reporting channels and publicly announced by CDCR. Defendants MACOMBER and SANTORO were further on notice through multiple OIG reports – including the 2019 Special Review of SVSP, the 2021 follow-up finding that reforms had "failed," and the 2024 Annual Report documenting

systemic failures in use-of-force reporting and staff accountability – that SVSP personnel had repeatedly and systematically failed to intervene or use reasonable force to protect incarcerated persons facing attacks with deadly force, and that the department's internal accountability mechanisms were inadequate to deter such failures. Despite this documented pattern of prior violence and institutional dysfunction at the very institution under their authority, Defendants MACOMBER and SANTORO knowingly condoned, ratified, and acquiesced in that unlawful inaction and took no corrective measures to prevent the foreseeable recurrence of lethal violence at SVSP.

108.    During the April 8, 2025, attack, Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 failed to intervene or use reasonable force to protect DECEDENT, despite being armed and within immediate proximity of the attack. Correctional officers stood by for over three minutes as DECEDENT was stabbed nearly one-hundred-eighty times with makeshift knives, suffering mortal wounds to his torso, back, face, neck, head, and eyes.

109.    Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 further exhibited deliberate indifference by failing to summon immediate medical aid, delaying life-saving measures such as CPR, and failing to transport DECEDENT for emergency care in a timely manner.

110.    After the assault, Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 failed to preserve evidence, failed to report truthfully on the incident, and disseminated graphic video footage of DECEDENT'S murder through personal cell phones and social media, violating his dignity and PLAINTIFFS' constitutional rights to privacy, due process, and familial integrity.

111.    These acts and omissions were undertaken with reckless disregard for DECEDENT'S life and the constitutional rights of his family, causing immense physical and emotional suffering.

112.    Individual Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, acting in their individual capacities, implemented and enforced policies, customs,

and practices that demonstrated deliberate indifference to DECEDENT's safety, including but not limited to inadequate staffing decisions, deficient inmate classification procedures, and failure to respond to documented threats and security concerns. These Individual Defendants knew of and disregarded an excessive risk to DECEDENT's safety.

113.    As a direct and proximate result of actions and omissions of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, DECEDENT suffered extreme pain, terror, and physical injury, culminating in his wrongful death. The ESTATE OF JOSEPH MENDOZA, by and through Celina Mendoza, Zina Kumetat and Ismael Mendoza, as the successors-in-interest to Joseph Mendoza, and as DECEDENT'S surviving family, have suffered severe emotional distress, loss of companionship, comfort, love, and financial support, and will continue to suffer these injuries for the remainder of their lives.

114.    The acts and omissions of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 and each of them were malicious, oppressive, and carried out with callous disregard for DECEDENT'S life and Celina Mendoza, Zina Kumetat and Ismael Mendoza's constitutional rights, thereby entitling THE ESTATE OF JOSEPH MENDOZA to compensatory and punitive damages as permitted by law.

115.    THE ESTATE OF JOSEPH MENDOZA also seeks reasonable attorneys' fees and costs pursuant to section 1988 of title 42 of the United States Code.

## SECOND CAUSE OF ACTION

**Wrongful Death – California Code of Civil Procedure sections 377.60 et seq.**

**(By THE ESTATE OF JOSEPH MENDOZA Against All DEFENDANTS)**

116.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

117.    This cause of action is brought pursuant to California Code of Civil Procedure section 377.60 et seq. by Plaintiffs CELINA MENDOZA, ZINA KUMETAT and ISMAEL MENDOZA, the lawful heirs and successors of DECEDENT, to recover damages for his wrongful death. This cause of action arises exclusively under state law.

///

118.    At all relevant times, DEFENDANTS, and each of them, owed DECEDENT a duty of reasonable care to ensure his safety, protection, supervision, and medical care while in state custody. Defendant CDCR, through its employees and agents, owed the same duty of care to DECEDENT pursuant to Government Code sections 815.2(a) and 815.6.

119.    DEFENDANTS breached that duty by, among other things:

    a.  Failing to remove or re-house DECEDENT despite credible, documented threats of gang retaliation;

    b.  Disclosing confidential information about the contraband seizure and DECEDENT'S request for protective custody, thereby branding him a target;

    c.  Allowing DECEDENT to remain housed in a known high-risk area of Facility C with his identified enemies;

    d.  Failing to intervene or deploy reasonable force during prolonged and violent assault lasting more than three minutes; and

    e.  Failing to summon immediate medical assistance or render life-saving care.

120.    As a direct and proximate result of these negligent, reckless acts and omissions by the Individual Defendants, DECEDENT suffered catastrophic injuries and died on April 8, 2025, at SVSP.

121.    At all relevant times, the Individual Defendants were acting within the course and scope of their employment with Defendant CDCR. Defendant CDCR is vicariously liable for the state law violations of its employees under the doctrine of respondeat superior and Government Code section 815.2(a). Nothing in this cause of action is intended to assert, and shall not be construed as asserting, a claim for damages against Defendant CDCR under section 1983 of title 42 of the United States Code.

122.    The wrongful acts and omissions of the Individual Defendants, and each of them, constitute negligence and recklessness proximately causing the death of DECEDENT

and resulting injuries to PLAINTIFFS. Each Individual Defendant is liable in his or her individual capacity for such acts and omissions.

123.    As a result of the conduct described herein, PLAINTIFFS - including DECEDENT'S wife, mother, father, brother and sister – have suffered and continue to suffer severe emotional distress, grief, and loss of love, companionship, comfort, care, assistance, protection, affection, moral support, and society of DECEDENT.

124.    PLAINTIFFS have also suffered economic losses, including the loss of financial support, gifts, and benefits, as well as funeral and burial expenses, all in amounts to be proven at trial.

125.    The conduct of DEFENDANTS, and each of them, was outrageous, malicious, and in conscious disregard for DECEDENT'S life and PLAINTIFFS' rights, thereby entitling PLAINTIFFS to exemplary and punitive damages against said Individual Defendants to the fullest extent permitted by law.

126.    PLAINTIFFS seek general, special, and punitive damages against the Individual Defendants, together with interest, costs of suit, and attorneys' fees as authorized by statute, including Code of Civil Procedure section 1021.5.

**THIRD CAUSE OF ACTION**

**Negligence – California Government Code section 845.6**

**Failure to Summon Medical Care**

**(By THE ESTATE OF JOSEPH MENDOZA Against All DEFENDANTS)**

127.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

128.    This cause of action arises exclusively under California state law, specifically Government Code section 845.6. At all relevant times, the Individual Defendants, and each of them, owed DECEDENT a statutory and common law duty to summon immediate and appropriate medical care when he was in obvious need of such care, pursuant to California Government Code section 845.6. Defendant CDCR, as the employing public entity, owed

the same duty through its employees and agents pursuant to Government Code sections 845.6 and 815.2(a).

129.    Section 845.6 imposes liability on public employees, and by extension their employing public entities, who know or have reason to know that a prisoner is in need of immediate medical care and failed to take reasonable action to summon such care.

130.    On April 8, 2025, while housed in the general population at SVSP, DECEDENT was viciously attacked by inmates Edgar Frayre and Nicolas Young and sustained nearly one-hundred-eighty stab wounds to his torso, back, face, neck, head, and eyes. The assault was clearly visible to SVSP correctional officers and staff, including DOES 1 through 50, who observed the attack for over three minutes yet failed to intervene or summon emergency medical assistance.

131.    Even after the attack concluded and DECEDENT lay motionless, bleeding, and unresponsive, the Individual Defendants failed to promptly call for medical personnel, initiate life saving measures such as CPR, or arrange for immediate transport to a medical facility.

132.    The Individual Defendant's omissions occurred in direct violation of CDCR's emergency response of use of force policies, which mandate that staff immediately notify medical staff and initiate lifesaving efforts upon discovery of a serious injury or assault.

133.    Each DEFENDANT knew or reasonably should have known that DECEDENT required immediate medical attention. Their failure to act constituted negligence and a breach of their statutory duty under Government Code section 845.6. Each Individual Defendant is liable in his or her individual capacity for such failure.

134.    At all relevant times, the Individual Defendants, including DOES 1 through 50, were acting within the course and scope of their employment with Defendants CDCR. Defendant CDCR is vicariously liable for the state law violations of its employees under the doctrine of respondeat superior and Government Code section 815.2(a). Nothing in this cause of action is intended to assert, and shall not be construed as asserting, a claim for damages against Defendant under section 1983 of title 42 of the United States Code.

135.    As a direct and proximate result of the Individual Defendants' failure to summon medical care, DECEDENT suffered prolonged pain and agony and ultimately succumbed to his injuries.

136.    PLAINTIFFS have sustained severe emotional distress and consequential damages, including funeral and burial expenses, loss of companionship, comfort, and financial support, and other damages according to proof at trial.

137.    The conduct of the Individual Defendants, and each of them, was wanton, reckless, and in conscious disregard of DECEDENT'S life and PLAINTIFFS' rights, thereby entitling PLAINTIFFS to compensatory, special and punitive damages as permitted by law, along with costs of suit and attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

## FOURTH CAUSE OF ACTION

### Negligent Hiring, Training, Supervision, and Retention

### (Against Defendant CDCR Only)

138.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

139.    At all relevant times, Defendant CDCR had a legal duty to hire, train, supervise, and retain competent correctional officers, supervisors, and staff to ensure the safety, protection, and humane treatment of inmates under its custody and care, including DECEDENT.

140.    DEFENDANTS owed this duty under California common law, as well as under statutory obligations imposed by title 15 of the California Code of Regulations, the CDCR Department Operations Manual ("DOM") and the California Constitution, which collectively require state correctional agencies to maintain a safe, secure, and lawful custodial environment.

141.    DEFENDANTS breached their duties by hiring, retaining, and failing to properly train and supervise correctional employees who were unfit for their positions,

including individuals who had demonstrated histories of misconduct and disregard for inmate safety, and tolerance for violence and retaliation within CDCR institutions.

142. DEFENDANTS failed to:

    a. Implement and enforce adequate screening and background procedures during hiring and retention of correctional staff;

    b. Provide sufficient training regarding inmate safety, use of force, and emergency response;

    c. Properly train staff in recognizing and responding to known threats of inmate-on-inmate violence;

    d. Ensure employees were adequately trained and supervised on the lawful and confidential handling of institutional video footage and inmate information;

    e. Implement adequate internal controls, screening protocols, or supervision to detect and prevent staff corruption in contraband smuggling operations, despite repeated large-quantity seizures of cellphones, tobacco, and narcotics from inmates that could not have entered maximum-security facilities without staff facilitation;

    f. Investigate or discipline staff engaged in contraband smuggling, even when confronted with obvious indicators including: (i) distribution-level quantities of contraband; (ii) family allegations of specific officers facilitating smuggling; (iii) patterns of contraband seizures from inmates with specific job assignments; and (iv) the removal of dayroom supervisory staff immediately following inmate deaths involving gang drug retaliation;

    g. Investigate or discipline staff known to engage in retaliation, dereliction of duty, or dissemination of confidential material; and

    h. Supervise personnel to ensure prompt response to assaults, immediate summoning of medical aid, and adherence to CDCR safety policies.

///

143.     These failures resulted in a pattern and practice of deliberate indifference and gross mismanagement, which directly created and perpetuated the unsafe and unconstitutional conditions that caused DECEDENT'S death.

144.     Defendant CDCR, through its managers, supervisors, and policymakers, knew or should have known of prior similar incidents and a pattern of misconduct by correctional officers at SVSP involving failure to protect inmates, failure to intervene during assaults, failure to summon medical care, and misuse of confidential materials, yet failed to take corrective or preventive action.

145.     This failure to act, and DEFENDANTS' continued retention and supervision of unfit personnel, constituted negligence and deliberate indifference, creating a dangerous environment that foreseeably resulted in DECEDENT'S brutal murder and the subsequent dissemination of video footage depicting his death.

146.     At all times relevant, DOES 1 through 50, were acting within the course and scope of their employment with Defendant CDCR, rendering that entity vicariously liable under California Government Code section 815.2(a).

147.     As a direct and proximate result of DEFENDANTS' negligent hiring, training, supervision, and retention, DECEDENT suffered extreme physical and emotional pain, leading to his wrongful death, and PLAINTIFFS have sustained and continue to sustain severe emotional distress, loss of financial and familial support, funeral and burial expenses, and other damages in amounts to be proven at trial.

148.     The conduct of DEFENDANTS, and each of them, was wanton, reckless, and in conscious disregard for the rights and safety of DECEDENT and PLAINTIFFS, thereby entitling PLAINTIFFS to compensatory and punitive damages, as well as costs of suit and attorneys' fees pursuant to Code of Civil Procedure section 1021.5.

///

///

///

///

**FIFTH CAUSE OF ACTION**

**Negligence**

**(By THE ESTATE OF JOSEPH MENDOZA Against All DEFENDANTS)**

149.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

150.    This cause of action arises exclusively under California state law. At all relevant times, the Individual Defendants, and each of them, owed DECEDENT a duty of reasonable care to protect him from foreseeable harm, to maintain a reasonably safe custodial environment, to exercise due care in supervising staff and inmates, and to ensure compliance with institutional safety, emergency response, and confidentiality standards. Defendant CDCR, as the employing public entity, owed the same duties of care through its employees and agents pursuant to Government Code sections 815.2(a) and 815.6.

151.    The Individual Defendants likewise owed PLAINTIFFS a duty of care to avoid conduct that would foreseeably cause them emotional injury and deprivation of their familial relationship with DECEDENT.

152.    The Individual Defendants breached these duties by, among other acts and omissions:

        a.    Failing to remove or re-house DECEDENT despite credible intelligence of imminent gang retaliation;

        b.    Disclosing confidential information about the narcotic and contraband seizure and DECEDENT'S protective custody request, thereby branding him a target;

        c.    Allowing DECEDENT to remain housed in a known high-risk area with identified enemies;

        d.    Failing to intervene during a prolonged and brutal assault that lasted more than three minutes while armed officers stood by;

        e.    Failing to summon immediate medical assistance or render life-saving care following the assault;

f.  Permitting and tolerating the possession and use of personal cell phones by custodial personnel within the secure perimeter of SVSP;

g.  Failing to prevent, control, or discipline staff who disseminated graphic video footage of DECEDENT'S murder and mutilated remains; and

h.  Failing to properly train, supervise, and monitor employees to ensure compliance with CDCR regulations, title 15 of the California Code of Regulations, and applicable state law.

153.    These acts and omissions were foreseeable causes of DECEDENT'S death and the resulting harm to PLAINTIFFS. The Individual Defendants knew or should have known that their failures created a substantial risk of serious injury and death. Each Individual Defendant is liable in his or her individual capacity for such acts and omissions.

154.    Pursuant to California Government Code section 820(a), public employees are liable for injuries caused by their acts or omissions to the same extent as a private person.

155.    At all relevant times, the Individual Defendants, including DOES 1 through 50, were acting within the course and scope of their employment with Defendant CDCR. Defendant CDCR is vicariously liable for the state law violations of its employees under the doctrine of respondeat superior and Government Code section 815.2(a). Nothing in this cause of action is intended to assert, and shall not be construed as asserting, a claim for damages against Defendant CDCR under section 1983 of title 42 of the United States Code.

156.    As a direct and proximate result of the Individual Defendant's negligence, DECEDENT endured extreme physical pain, terror, and suffering before his death. PLAINTIFFS have suffered and continue to suffer severe emotional distress, loss of love, companionship, comfort, care, assistance, protection, affection, moral support, and financial contributions, as well as funeral and burial expenses and other economic and non-economic damages in amounts to be proven at trial.

157.    The conduct of the Individual Defendants, and DOES 1 through 50, and each of them, was grossly, negligent, wanton, and in reckless disregard of the rights and safety of DECEDENT and PLAINTIFFS, thereby entitling PLAINTIFFS to compensatory and

punitive damages against said Individual Defendants, along with costs of suit and attorneys' fees as authorized by law, including Code of Civil Procedure section 1021.5.

### SIXTH CAUSE OF ACTION

**Invasion of Privacy**

**(By All PLAINTIFFS Against All DEFENDANTS)**

158.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

159.    At all relevant times, the Individual Defendants were acting within the course and scope of their employment with Defendant CDCR. Defendant CDCR is vicariously liable for the state law violations of its employees under Government Code S 815.2(a). Nothing in this cause of action asserts federal damages against Defendant CDCR.

160.    At all relevant times, the Individual Defendants and DOES 1 through 50, owed DECEDENT and his surviving family a duty to preserve the confidentiality and dignity of his person and image, and to prevent the unauthorized recording, possession, or dissemination of any photographic or video depictions of his murder or mutilated remains.

161.    This duty arises under California and federal constitutional privacy protections, California common law, the California Information Practices Act, sections 3321 and 3391 of title 15 of the California Code of Regulations, and the CDCR Department Operations Manual ("DOM"), all of which prohibit the unauthorized disclosure of inmate information, images, or investigative material.

162.    On or about April 8, 2025, following DECEDENT'S brutal and fatal stabbing inside SVSP, SVSP personnel, including DOES 1 through 50, recorded, possessed, and disseminated video footage of the attack and its aftermath using their personal cellphones – devices which they should not have been authorized to possess or use within the secure perimeter.

163.    DEFENDANTS thereafter shared and circulated this footage with other staff members, acquaintances, family members, and via social media platforms, knowing that the content depicted the graphic, bloodied, and mutilated remains of DECEDENT.

164.    The dissemination of this footage was malicious, reckless, and without any legitimate correctional purpose. It served only to gratify prurient curiosity, shock viewers, and humiliate DECEDENT and his family, including PLAINTIFFS, in violation of both CDCR confidentiality policy and California Penal Code section 647.9 ("The Kobe Bryant Act of 2020"), which expressly prohibits first responders from photographing or distributing images of deceased victims for non-official purposes.

165.    As a direct and foreseeable result of DEFENDANTS' actions, members of the Mendoza family, including PLAINTIFFS, were exposed to graphic, widely circulated images of their loved one's violent death and bloodied, mutilated remains. PLAINTIFFS have suffered profound psychological and emotional trauma, nightmares, anxiety, public humiliation, and re-traumatization as the images continue to circulate online.

166.    DEFENDANTS' conduct constitutes an unreasonable intrusion upon PLAINTIFFS' and DECEDENT'S privacy interest, public disclosure of private facts, and a deprivation of constitutional rights under the Fourteenth Amendment guaranteeing privacy, dignity, and familial association.

167.    DEFENDANTS' acts and omissions were intentional, malicious, and in conscious disregard of DECEDENT'S dignity and PLAINTIFF'S emotional well-being and were undertaken with knowledge that such dissemination would cause severe harm.

168.    As a direct and proximate result of DEFENDANTS' unlawful conduct, PLAINTIFFS have suffered severe emotional distress, mental anguish and humiliation, and loss of dignity, and have incurred and will continue to incur damages in amounts to be proven at trial.

169.    The conduct of DEFENDANTS, and each of them, was willful, wanton, and oppressive, thereby entitling PLAINTIFFS to an award of general, special, and punitive damages, attorneys' fees, and costs of suit, pursuant to Civil Code sections 52 and 3294, section 1988 of title 42 of the United States Code, and Code of Civil Procedure section 1021.5.

///

1

## **SEVENTH CAUSE OF ACTION**

2

### **Intentional Infliction of Emotional Distress**

3

### **(By All PLAINTIFFS Against Defendants**

4

### **MACOMBER, SANTORO, MADSEN, and DOES 1 through 50)**

5     170.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs

6 as though fully set forth herein.

7     171.    At all relevant times, the Individual Defendants, including DOES 1 through

8 50, were acting within the course and scope of their employment with Defendant CDCR.

9 Defendant CDCR is vicariously liable for the state law violations of its employees under

10 Government Code section 815.2(a). Nothing in this cause of action asserts federal damages

11 against Defendant CDCR under section 1983 of title 42 of the United States Code.

12     172.    At all relevant times, Defendants MACOMBER, SANTORO, MADSEN, and

13 DOES 1 through 50, and each of them, owed PLAINTIFFS and DECEDENT a duty to

14 refrain from engaging in extreme, outrageous, and reckless conduct that would foreseeably

15 cause severe emotional distress.

16     173.    DEFENDANTS intentionally and recklessly engaged in conduct that was so

17 extreme and outrageous as to exceed all bounds of decency tolerated in a civilized society.

18 This conduct included, but was not limited to:

19         a.  Failing to protect DECEDENT from a known and imminent risk of lethal

20             gang retaliation;

21         b.  Standing by and watching as DECEDENT was brutally stabbed nearly

22             one hundred times over more than three minutes, without intervening or

23             summoning immediate medical aid;

24         c.  Failing to provide life-saving assistance, leaving DECEDENT to die in

25             agony on the dayroom floor; and

26         d.  Recording, possessing, and disseminating graphic video footage of

27             DECEDENT'S murder and bloodied, mutilated remains for non-official

28

and prurient purposes, and sharing that footage with coworkers, acquaintances, and on social media platforms.

174. The acts of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 were undertaken with actual malice, oppression, and conscious disregard for the life, dignity, and humanity of Decedent Joseph Mendoza, and with reckless indifference to the emotional well-being of his surviving family.

175. The conduct of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 was intended to cause or was carried out with reckless disregard of the probability of causing severe emotional distress to PLAINTIFFS, who were foreseeably and directly harmed by the outrageous behavior of SVSP and CDCR personnel.

176. As a direct and proximate result of the actions and omissions of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, PLAINTIFFS have suffered severe and ongoing emotional distress, including grief, anxiety, nightmares, humiliation, shock, depression, and re-traumatization after witnessing and/or learning of the public dissemination of the video depicting their loved one's violent death.

177. The acts of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 were carried out intentionally, maliciously, fraudulently, and oppressively, and in conscious disregard of PLAINTIFFS' rights and the sanctity of their familial relationship, entitling PLAINTIFFS to an award of exemplary and punitive damages under Civil Code section 3294.

178. PLAINTIFFS are entitled to compensatory damages, including special and general damages for emotional suffering, together with punitive damages, attorneys' fees, costs of suit, and such other relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

### Violation of California Civil Code section 52.1 (Tom Bane Act)

### (By THE ESTATE OF JOSEPH MENDOZA Against All DEFENDANTS)

179. PLAINTIFFS reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

180.    This action is brought pursuant to California Civil Code section 52.1 and California Government Codes sections 815.2 and 820. Each one of the Individual Defendants is liable under section 820 for his or her own acts or omissions, and the public entity defendants are vicariously liable for the acts committed within the course and scope of employment. This claim asserts vicarious liability only against the public entities.

181.    THE ESTATE OF JOSEPH MENDOZA, through its successors-in-interest, pursuant to Code of Civil Procedure sections 377.20 et seq., bring this cause of action for violations of DECEDENT'S rights secured by the Eight Amendment to the United States Constitution, article I, sections 1, 7, and 17 of the California Constitution, and California statutory and regulatory law.

182.    While under custody and control of DEFENDANTS at SVSP, DECEDENT had a constitutional right to be free from cruel and unusual punishment, deliberate indifference to his safety and medical needs, and unreasonable interference with his rights to life and personal security.

183.    DEFENDANTS interfered with and violated those rights by threats, intimidation, and coercion, including but not limited to:

    a.    Knowingly exposing DECEDENT to known gang-affiliated inmates despite explicit protective custody requests and verified threats to his life;

    b.    Publicly disclosing DECEDENT'S protective custody requests and involvement in a substantial narcotic and contraband seizure, labeling him a "snitch" and increasing the risk of retaliation;

    c.    Failing to intervene during a prolonged and lethal inmate assault while armed officers stood by;

    d.    Failing to summon immediate medical aid and delaying lifesaving treatment in violation of Government Code section 845.6 and CDCR emergency response policies; and

///

///

e. Maintaining customs and practices that tolerated deliberate indifference to inmate safety, inadequate staffing, and the withholding of aid during violent incidents.

184. These acts were intentional, volitional, and undertaken with specific intent, or with deliberate indifference with DECEDENT'S exercise and enjoyment of his constitutional and statutory rights, satisfying the requirements under *Cornell v. City & County of San Francisco* (2017) 17 Cal.App.5th 766, 801-802.

185. The threats, intimidation, and coercion described herein were not inherent in or necessary to any legitimate penological or law enforcement activity.

186. As a direct and proximate result of the conduct of DEFENDANTS and DOES 1 through 50, DECEDENT suffered extreme physical pain, terror, and mental anguish prior to his death, and ultimately lost his life.

187. The acts of DEFENDANTS and each of them, were malicious, oppressive, and carried out with callous disregard for DECEDENT'S rights and dignity.

188. As a direct and proximate result of DEFENDANTS' violation of California Civil Code section 52.1 and of DECEDENT'S rights under the United States and California Constitutions, PLAINTIFFS sustained injuries and damages, and against each and every Defendant is entitled to relief, including punitive damages against all Individual Defendants, and all damages allowed by California Civil Code sections 52 and 52.1, and California law, not limited to costs, attorneys' fees and civil penalties.

## NINTH CAUSE OF ACTION

### Violation of California Civil Code section 52.1 (Tom Bane Act)

### (By All PLAINTIFFS Against All DEFENDANTS)

189. PLAINTIFFS reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

190. This action is brought pursuant to California Civil Code section 52.1 and California Government Codes sections 815.2 and 820. Each individual defendant is liable under section 820 for their acts or omissions, and the public entity defendants are vicariously

liable for the acts committed within the course and scope of employment. This claim asserts vicarious liability only against the public entities.

191.    PLAINTIFFS are the surviving wife, parents, brother and sister of DECEDENT. They possess independent rights to familial privacy, dignity, and association, protected by article I, section 1, of the California Constitution and secured under Civil Code section 52.1.

192.    DEFENDANTS, including DOES 1 through 50, acting under color of state law, intentionally and maliciously interfered with and violated PLAINTIFFS' rights through threats, intimidation, and coercion, including but not limited to:

    a.  Recording, possessing, and disseminating graphic video footage of DECEDENT'S murder and mutilated remains without authorization or legitimate purpose;

    b.  Permitting and enabling the spread of that footage among coworkers, acquaintances, and social media users;

    c.  Inflicting emotional terror, humiliation, and distress on PLAINTIFFS by publicly exposing the violent and degrading images of their loved one; and,

    d.  Failing to safeguard the family's constitutional right to privacy and dignity under article I, section 1, of the California Constitution and applicable CDCR regulations.

193.    DEFENDANTS' conduct was intentional, malicious, and undertaken with specific intent to interfere with PLAINTIFF'S enjoyment of their constitutional and statutory rights. The dissemination of the footage served no legitimate governmental purpose and was motivated by callous indifference and personal gratification, constituting threats, intimidation, and coercion within the meaning of Civil Code section 52.1.

194.    As a direct and foreseeable result of DEFENDANTS' conduct, PLAINTIFFS were exposed to public circulation of the footage depicting the brutal murder and mutilated remains of DECEDENT. PLAINTIFFS suffered severe and continuing emotional distress,

humiliation, trauma, anxiety, depression, and loss of dignity – injuries that were foreseeable and intended consequences of DEFENDANTS' acts.

195.    DEFENDANTS' conduct shocks the conscience and constitutes an egregious abuse of state power that unlawfully interfered with PLAINTIFF'S constitutional rights to privacy, dignity, due process, and familial association.

196.    As a direct and proximate result of DEFENDANTS' violation of California Civil Code section 52.1 and of DECEDENT'S rights under the United States and California Constitutions, PLAINTIFFS sustained injuries and damages, and against each and every Defendant is entitled to relief, including punitive damages against all Individual Defendants, and all damages allowed by California Civil Code sections 52 and 52.1, and California law, not limited to costs, attorneys' fees and civil penalties.

## TENTH CAUSE OF ACTION

### Violation of Civil Rights – 42 U.S.C. § 1983

### Violation of Fourteenth Amendment – Deprivation of Rights of

### Plaintiffs to Familial Relationships with the Decedent

### [By All PLAINTIFFS Against Defendants

### MACOMBER, SANTORO, MADSEN, and DOES 1 through 50]

197.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

198.    This cause of action is brought under section 1983 of title 42 of the United States Code to redress violations of the Fourteenth Amendment to the United States Constitution, which protects against deprivation of life, liberty, or property without due process of law and safeguards the substantive right to familial association and bodily and emotional privacy.

199.    At all relevant times, Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, and each of them, acted under color of state law and within the course and scope of their official duties as correctional and supervisory personnel.

///

200.    PLAINTIFFS, as the immediate family members of DECEDENT, possess constitutionally protected liberty interests in their familial relationship with him, including the rights to companionship, love, care, comfort, and emotional support.

201.    The deliberate, reckless, and conscience shocking conduct of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 deprived PLAINTIFFS of their protected familial relationship with DECEDENT by:

  a. Failing to protect him from a known and specific threat of gang violence despite repeated warnings;

  b. Standing by and observing as he was brutally stabbed nearly one hundred times without timely intervention;

  c. Failing to summon or provide immediate medical care, prolonging his suffering and ensuring his death; and

  d. Recording, sharing, and publicly disseminating video footage of his murder and remains, thereby inflicting ongoing emotional trauma and violating PLAINTIFF'S constitutional rights to privacy, dignity, and familial association.

202.    The acts and omissions of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 shock the conscience and were undertaken maliciously and with deliberate indifference to the familial and privacy rights of PLAINTIFFS, in violation of the Fourteenth Amendment's substantive due process protections.

203.    These actions served no legitimate penological or governmental purpose and instead reflected a culture of impunity, disregard, and abuse perpetuated by policies, customs, and practices of CDCR and SVSP.

204.    As a direct and proximate result of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50 actions, PLAINTIFFS suffered the permanent loss of their familial relationship with DECEDENT, including his love, companionship, guidance, moral support, and society, as well as severe emotional distress and trauma resulting from the knowledge and public exposure of his death.

205.    The conduct of Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, and each of them, was willful, wanton, malicious, oppressive, and in conscious disregard for PLAINTIFFS' constitutional rights, entitling them to an award of compensatory and punitive damages.

206.    PLAINTIFFS seek general, special, and punitive damages, together with attorneys' fees and costs pursuant to section 1988 of title 42 of the United States Code, and such other and further relief as the Court deems just and proper to vindicate their rights and deter future misconduct.

**ELEVENTH CLAIM FOR RELIEF**

**Declaratory and Injunctive Relief**

**Violation of 8th and 14th Amendments – Failure to Protect from Harm**

**(By All PLAINTIFFS Against Defendants**

**MACOMBER and SANTORO in Their Official Capacities)**

207.    PLAINTIFFS reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

208.    This claim for relief is brought pursuant to sections 2201-2202 of title 28 of the United States Code, Federal Rules of Civil Procedure, rules 57 and 65, and the equitable powers of this Court. It is also brought under the doctrine established in *Ex Parte Young*, 209 U.S. 123 (1908), which authorizes injunctive relief against state officials acting in their official capacities to prevent ongoing violations of federal law.

209.    At all relevant times, Defendants MACOMBER and SANTORO, identified as the CDCR Secretary and the SVSP Warden respectively, have been and continue to be responsible for the policies, customs, and practices governing correctional staff at SVSP and within the CDCR. These Defendants, acting under color of state law, are sued solely in their official capacities for prospective declaratory and injunctive relief.

210.    A present and actual controversy exists between PLAINTIFFS and Defendants MACOMBER and SANTORO regarding the ongoing possession, retention, and potential continued dissemination of unauthorized video and photographic recordings

depicting the brutal assault, death, and mutilated remains of DECEDENT. PLAINTIFFS also challenge the continuing CDCR and SVSP policies, customs, and omissions that enabled such conduct to occur and that create a substantial risk of similar future violations of the rights of PLAINTIFFS and others.

211.    PLAINTIFFS have suffered and continue to suffer irreparable harm to their constitutional and statutory rights, including their rights to privacy, dignity, familial association, and due process of law. The unauthorized possession and distribution of the video footage depicting the DECEDENT'S murder, and the lack of institutional safeguards to prevent such dissemination, have caused and will continue to cause severe emotional trauma, humiliation, and re-victimization of the Mendoza family.

212.    PLAINTIFFS have no adequate remedy at law to address the ongoing violations and continuing risk of future harm. Monetary damages cannot remedy the widespread publication or circulation of such sensitive and degrading material, nor can it redress the systemic deficiencies in CDCR and SVSP policies that foster these violations.

213.    Unless restrained by this Court, DEFENDANTS and their agents, employees, and successors in office will continue to possess, maintain, and potentially disseminate unauthorized video and photographic materials related to the attack and death of DECEDENT. They will also continue to operate under policies and practices that endanger inmate safety, permit misuse of personal devices within secure perimeters, and fail to ensure proper privacy and evidence handling protocols.

214.    PLAINTIFFS therefore seek declaratory and injunctive relief declaring that such Defendants' conduct, and the policies and omissions permitting such conduct, violated the rights secured to PLAINTIFFS and DECEDENT under the Eighth and Fourteenth Amendments to the United States Constitution, article I, section 1, of the California Constitution, and California Civil Code section 52.1.

215.    PLAINTIFFS further seek permanent injunctive relief requiring DEFENDANTS, their officers, agents, employees, and successors in office to:

a. Preserve and secure all evidence related to the April 8, 2025, assault of DECEDENT, including but not limited to CCTV footage, handheld video recordings, photographs, incident reports, radio transmissions, digital communications, and log entries;

b. Identify, retrieve, and permanently remove or destroy all unauthorized personal recordings, images, or copies of video depicting the attack, murder, or remains of DECEDENT, and ensure that no employee or agent of CDCR or SVSP retains, transmits, or uses such materials for non-official purposes;

c. Implement and enforce comprehensive policies and training requiring immediate reporting and disciplinary action for any staff member who photographs, records, or disseminates images of deceased inmates or victims for personal or non-official use;

d. Institute strict control and monitoring of personal cellular devices within the secure perimeter of all CDCR institutions, including SVSP, to prevent unauthorized recording and distribution of confidential or graphic materials;

e. Develop and enforce privacy and evidence handling protocols ensuring the confidentiality and dignity of deceased individuals, including chain-of-custody procedures, restricted access to sensitive evidence, and disciplinary consequences for breaches;

f. Reform and implement protective custody and emergency response policies to ensure timely intervention and medical care for inmates facing credible threats, and mandatory training and oversight mechanisms to prevent deliberate indifference to inmate safety; and,

g. Provide periodic public reporting and compliance audits verifying adherence to above policies, subject to Court supervision for a period deemed appropriate by this Court.

216.    PLAINTIFFS also seek an order declaring that the actions, omissions, and policies of DEFENDANTS violated the constitutional rights of DECEDENT and of PLAINTIFFS, and that ongoing adherence to such practices would continue to cause irreparable harm.

217.    The balance of equities and the public interest weigh strongly in favor of issuing the requested injunctive relief. Protecting the dignity of privacy of victims, preserving the integrity of law enforcement operations, and ensuring humane treatment of incarcerated individuals serve compelling public purposes and outweigh any asserted administrative burden on DEFENDANTS.

218.    Accordingly, PLAINTIFFS are entitled to declaratory and injunctive relief as set forth herein and in the Prayer for Relief, together with attorneys' fees and costs pursuant to section 1988 of title 42 of the United States Code, California Civil Code section 52.1(h), and Code of Civil Procedure section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS respectfully request that this Court enter judgment in their favor against DEFENDANTS, jointly and severally, and award the following relief:

1.  Compensatory damages for the wrongful death of Joseph Mendoza, including but not limited to the loss of love, companionship, comfort, affection, society, services, solace, and moral support, as well as the loss of financial support and funeral and burial expenses;

2.  Compensatory damages for the emotional distress suffered by Celina Mendoza, Zina Kumetat, Ismael Mendoza, Adrian Mendoza and Savina Decarli due to the negligent infliction of emotional distress caused by the loss of their son;

3.  Compensatory damages for all other economic and non-economic losses suffered by PLAINTIFFS as a result of DEFENDANTS' negligence, including but not limited to medical expenses, emotional pain and suffering, and other related losses;

4.  Punitive damages against Defendants MACOMBER, SANTORO, MADSEN, and DOES 1 through 50, acting in their individual capacities, for their willful deliberate indifference and reckless disregard for the rights and safety of Joseph Mendoza, to the extent permitted by law;

5.  Attorneys' fees and costs of suit incurred in this action, as provided by law, including but not limited to under California Code of Civil Procedure § 1021.5 and any other applicable statutes;

6.  Pre-judgment and post-judgment interest as allowed by law;

7.  That the Court retain jurisdiction to ensure compliance with injunctive orders and require periodic reporting by CDCR and SVSP concerning policy implementation;

8.  Such other and further relief as the Court may deem just and proper; and

9.  All other damages, penalties, costs, interest, and attorneys' fees as allowed by sections 1983 and 1988 of title 42 of the United States Code; California Code of Civil Procedure sections 377.20 et seq., 377.60 et seq., and 1021.5; California Civil Code sections 52 et seq., 52.1; and as otherwise may be allowed by California and/or federal law.


Respectfully Submitted,


Dated: February 19, 2026                    **HARRISON | KRISTOPHER, LLP**


By: _____
      Bryan J. Harrison, Esq.,
      Attorneys for Plaintiffs

1

## **DEMAND FOR TRIAL BY JURY**

2          Plaintiffs hereby demand trial of this matter by jury.

3

4          Respectfully Submitted,

5

6   Dated: February 19, 2026                **Harrison | Kristopher, LLP**

7

8                                    By: _____

9                                          Bryan J. Harrison, Esq.,
                                           Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28